Kelly H. Dove, Esq.
Nevada Bar No. 10569
Holly E. Cheong, Esq.
Nevada Bar No. 11936
SNELL & WILMER L.L.P.
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, NV 89169
Telephone:   (702) 784-5200
Facsimile:    (702) 784-5252
kdove@swlaw.com
hcheong@swlaw.com

*Attorneys for Defendant Wells Fargo Bank, N.A.*

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| EDWARD PATRICK FLAHERTY, an individual, | Case No. 3:22-cv-00025-MMD-CLB |
| Plaintiff, | **MOTION TO DISMISS** |
| vs. | |
| WELLS FARGO BANK, NATIONAL ASSOCIATION dba WELLS FARGO BANK NA; and DOES 1-50, ROES 51-100, | |
| Defendants. | |

Defendant Wells Fargo Bank, N.A. ("Wells Fargo"), by and through its counsel, the law firm of Snell & Wilmer L.L.P., moves this Court to dismiss Plaintiff Edward Patrick Flaherty's ("Plaintiff") Complaint (the "Motion").

This Motion is based on the following Memorandum of Points and Authorities, all papers on file with this Court, any documents incorporated by reference or attached to the Complaint, and any oral argument that this Court may entertain.

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

Plaintiff, Edward Flaherty, voluntarily wired $30,000 in funds to a Wells Fargo account. Days later, Mr. Flaherty discovered that he had been fooled by a fraudster and sought to have Wells Fargo return the money he had wired.  But Wells Fargo could not do that, as the money was already

1   gone from the account.  Mr. Flaherty now improperly seeks to hold Wells Fargo responsible for a

2   non-party fraudster's conduct and his own lapse in judgment.

3        While it is unfortunate that Mr. Flaherty was apparently the victim of fraud, the law is clear

4   and straightforward: Wells Fargo is not responsible for his loss.  As Mr. Flaherty details in his

5   Complaint, he intended to wire funds to his colleague, Andrew Levetown, but Mr. Levetown's

6   email had been hacked.  The hacker sent Mr. Flaherty wiring instructions via the hacked email

7   account and he took the proverbial bait, failing to verify that the wiring instructions were indeed

8   from Mr. Levetown.  Despite knowing that Mr. Levetown practiced law in the State of Maryland,

9   Mr. Flaherty voluntarily wired $30,000 into a Wells Fargo account opened in Mr. Levetown's

10  name, 1400 W. Newlands Drive, East Fernley, Nevada 89408, Account No. XXXXXX0700.  Three

11  days after the wire transfer, Mr. Levetown informed Mr. Flaherty that Mr. Levetown's email had

12  been hacked.  Only then did Mr. Flaherty realize that he was the victim of fraud and attempted to

13  get his money back.  By that time, however, the wired funds had already been removed from the

14  account.  Mr. Flaherty now seeks to recover his losses from Wells Fargo, but for the reasons

15  addressed below, Wells Fargo is not liable for the loss occasioned by the fraud on Mr. Flaherty and,

16  as such, the Complaint should be dismissed in its entirety.

17       Mr. Flaherty's claims against Wells Fargo fail as a matter of law.[1]  First, his negligence and

18  negligence per se claims fail for multiple reasons.  His allegations do not establish that Wells Fargo

19  had reason to suspect that the transaction was fraudulent, and even if that were not the case, U.S.

20  Department of Treasury Financial Crimes Enforcement Network ("FinCEN") regulations only

21  require Wells Fargo to report that information to the government, not Mr. Flaherty.  Independent

22  of that point, FinCEN regulations cannot give rise to negligence or negligence per se because those

23  doctrines require that the defendant have an underlying duty towards the plaintiff.  But common-

24  law principles establish that (1) absent extremely limited exception, no one has a duty to protect

25  another from the harm caused by a third-party and (2) a bank has no duty to non-customers.  And

26

27  _____

28  [1] Mr. Flaherty also asserts claims against Defendants Does 1-50, Roes 51-100, presumably the
    hackers who perpetrated the alleged fraud.  Wells Fargo does not opine as to those claims.

- 2 -

because the FinCEN regulations do not create a new private right of action, they do not create a new statutory duty that could support Plaintiff's negligence or negligence per se claims.

Mr. Flaherty's claim that Wells Fargo violated Uniform Commercial Code ("UCC") Article 4A fails because he did not allege that Wells Fargo had actual knowledge of the name-number mismatch, nor is there a Rule 11 basis to do so. Accordingly, Wells Fargo is immune from suit under the safe harbor provision of Nevada Revised Statute ("NRS") 104A.4207(2)(a).

Mr. Flaherty's claim that Wells Fargo violated NRS 41.1395 also fails because the statute only applies if Wells Fargo knew or had reason to know that he is over 60 years old. Nothing in the facts indicates Wells Fargo would know the age of Mr. Flaherty – a non-customer. This claim also fails because it requires Mr. Flaherty to have viable claim against Wells Fargo and, as discussed in the Motion, he has no claims against Wells Fargo that survive as a matter of law.

In sum, Mr. Flaherty's Complaint fails to state any viable cause of action and all claims against Wells Fargo should be dismissed.

## FACTUAL BACKGROUND AS ALLEGED IN THE COMPLAINT

In June 2021, Mr. Flaherty fell victim to a scam where someone hacked his colleague's email account. Compl. ¶ 17. On June 17, 2021, the alleged fraudster sent wiring instructions to Mr. Flaherty via the hacked email account. *Id.* at ¶ 14. On June 22, 2021, per the alleged fraudster's instructions, Mr. Flaherty wired $30,000 to a Wells Fargo account opened in Andrew Levetown's name, 1400 W. Newlands Drive, East Fernley, Nevada 89408, Account No. XXXXXX0700. *Id.* at ¶ 15. Mr. Flaherty does not allege that he first verified the wiring instructions with Mr. Levetown but does admit that he knew Mr. Levetown practiced law in the State of Maryland. *Id.* at ¶ 11.

After the transfer was complete, Mr. Levetown contacted Mr. Flaherty on June 25, 2021, requesting the status of the wire transfer. *Id.* at ¶ 16. That is when Mr. Levetown informed Mr. Flaherty that his email account had been hacked. *Id.* at ¶ 17. That same day, Mr. Flaherty contacted the Wells Fargo, alerting Wells Fargo to the scam, and Wells Fargo immediately told him that to contact his own bank, UBS, to request the return of the transfer. *Id.* at ¶ 18. Mr. Flaherty alleges that UBS contacted Wells Fargo twice and Wells Fargo replied around August 20, 2021 that the account had been emptied and there was nothing Wells Fargo could do. *Id.* at ¶ 19. Mr. Flaherty

1   further alleges that he wrote directly to Wells Fargo's corporate headquarters around August 19,

2   2021, demanding the return of the $30,000, but that Wells Fargo rejected that request.  *Id.* at ¶ 20.

3   Mr. Flaherty also alleges that he requested the name of the wire recipient, any other identifying

4   information, and that Wells Fargo report the fraud to local law enforcement.  *Id.* at ¶¶ 21-22.  Mr.

5   Flaherty claims that Wells Fargo refused those requests and claims that Wells Fargo allowed the

6   fraudster to open an account with insufficient or fraudulent identification.  *Id.* at ¶¶ 23-24.

7                                          **ARGUMENT**

8   **I.    LEGAL STANDARD.**

9        A court may dismiss a pleading for "failure to state a claim upon which relief can be

10  granted."  Fed. R. Civ. P. 12(b)(6).  In *Ashcroft v. Iqbal,* the Supreme Court clarified the two-step

11  approach district courts are to apply when considering motions to dismiss.  556 U.S. 662 (2009).

12       First, the Court must accept as true all well-pled factual allegations in the complaint.

13  However, legal conclusions or rote recitations of the elements of a cause of action are not entitled

14  to the assumption of truth.  *Id.* at 679; *see also Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555

15  (2007) (holding that a plaintiff's obligation "to provide the grounds of his entitlement for relief

16  requires more than labels and conclusions, and a formulaic recitation of the elements of the cause

17  of action will not do" and that courts considering a motion to dismiss are not bound by a complaint's

18  legal conclusions, deductions, and opinions couched as facts) (internal quotations and citation

19  omitted).  Second, the Court must consider whether the factual allegations in the complaint allege

20  a plausible claim for relief.  *Iqbal*, 556 U.S. at 679.  "A claim has facial plausibility when the

21  plaintiff pleads factual content that allows the court to draw a reasonable inference that the

22  defendant is liable for the alleged misconduct."  *Id.* at 678; *see also Twombly* 550, U.S. at 555

23  (holding "factual allegations must be enough to raise the right to relief above the speculative level").

24  When the claims in a complaint do not cross the line from conceivable to plausible, plaintiff's

25  complaint must be dismissed.  *Twombly*, 550 U.S. at 570.

26  / / /

27  / / /

28  / / /

Snell & Wilmer
L.L.P.
LAW OFFICES
1883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

## II.     AS A NON-CUSTOMER, WELLS FARGO DID NOT OWE PLAINTIFF A DUTY OF CARE, WHICH IS FATAL TO HIS NEGLIGENCE CLAIM.

Negligence has four necessary elements: (1) the existence of a duty of care, (2) breach of that duty, (3) legal causation, and (4) damages.  *Sanchez ex rel. Sanchez v. Wal-Mart Stores, Inc.*, 125 Nev. 818, 824, 221 P.3d 1276, 1280 (2009); *Larson v. Homecomings Financial LLC*, 680 F. Supp. 2d 1230, 1235 (D. Nev. 2009).  While Plaintiff asserts that "Wells Fargo had a duty of care to Flaherty when accepting his wire of $30,000 . . ." (Compl. ¶ 27), in fact, Wells Fargo does not have such a duty as a matter of law.

### A.     Banks Do Not Owe a Duty of Care to Non-Customers.

"The almost-universal law in this country is that banks owe a duty of care only to their own customers," and do not owe a duty of care to third parties or non-customers.  *SFS Check, LLC v. First Bank of Delaware*, 774 F.3d 351, 357 (6th Cir. 2014); *see also Evans v. ZB, N.A.*, 779 F. App'x 443, 444 (9th Cir. 2019) (holding that banks generally owe no duty to non-customers, applying California law); *Midwest Feeders, Inc. v. Bank of Franklin*, 886 F.3d 507, 519 (5th Cir. 2018) (holding that a bank generally owes no duty to a non-customer); *Eisenberg v. Wachovia Bank, N.A.*, 301 F.3d 220, 225 (4th Cir. 2002) (recognizing that courts in numerous jurisdictions have held that a bank does not owe a duty of care to a noncustomer with whom the bank has no direct relationship and holding that a bank does not owe a duty of care to a customer ); *Chang v. JPMorgan Chase Bank, N.A.*, 845 F.3d 1087, 1094 (11th Cir. 2017) (holding that as a general matter, "a bank does not owe a duty of care to a noncustomer with whom the bank has no direct relationship"); *Conder v. Union Planters Bank, N.A.*, 384 F.3d 397, 399 (7th Cir. 2004) (recognizing and endorsing majority rule refusing "to impose on banks a general duty of care toward persons who are not their customers and to whom therefore they have no contractual obligations").

To put a finer point on that general rule, courts have also consistently held that a bank does not owe a duty of care even to a noncustomer who is defrauded by the bank's customer through use of its services.  *Eisenberg*, 301 F.3d at 225; *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 286–87 (2d Cir. 2006); *Software Design & Application, Ltd. v. Hoefer & Arnett, Inc.*, 56 Cal. Rptr. 2d 756, 760

(Cal. App. 1996); *McCallum v. Rizzo*, No. 94288, 1995 WL 1146812 (Mass. Super. Ct. Oct. 13, 1995).  For example, in *McCallum v. Rizzo*, McCallum loaned money to the Tsongas Committee, an organization advocating the election of presidential candidate Paul Tsongas.  Rizzo, the chief fund raiser for the Committee, opened a bank account at Andover Bank in the Committee's name and listed himself as sole signatory.  *Id.*  The bank did not verify that Rizzo was authorized to transact business on behalf of the Committee, and Rizzo used the bank account to convert the proceeds of contributions and loans to the Committee to his own use.  McCallum sued Andover Bank on a theory of negligence, arguing that the bank owed a duty to contributors to exercise due care.  The court rejected McCallum's argument, holding that "[t]he mere fact that a bank account can be used in the course of perpetrating a fraud does not mean that banks have a duty to persons other than their own customers.  To the contrary, the duty is owed exclusively to the customer, not to the persons with whom the customer has dealings."  *Id.* at *2.

Courts have also held that banks do not owe a duty of care to noncustomers even when the noncustomer is the person in whose name an account was fraudulently opened.  *Eisenberg*, 301 F.3d at 226.  As a corollary, courts have likewise held that banks have no duty "to make an independent investigation of their customers' authority to use any particular unregistered trade name."  *Weil v. First Nat. Bank of Castle Rock*, 983 P.2d 812, 814 (Colo. App. 1999) (cited by the *Eisenberg* court with approval); *McCallum*, 1995 WL 1146812 at *2 (holding that "a bank's failure to investigate a customer's suspicious activity ... does not give rise to liability to the third party who is injured by the customer's fraud"); *SFS Check*, 774 F.3d at 357 (holding that although the threat posed by identity theft is serious, the court would not "impose a new duty on banks, particularly one that has been rejected by courts across the country").

The case of *Software Design & Application*, as discussed with approval in *Eisenberg*, is instructive.  There, a financial consultant embezzled money from Software Design through a bank account he opened bearing the company name. 56 Cal.Rptr.2d at 759–60.  The California Court of Appeal dismissed Software Design's negligence claim against the bank because there was no relationship between it and the bank.  *Id.* at 760–63.  Even though the bank account used to defraud Software Design bore its own name, the court held that a bank does not owe a duty of care to protect

noncustomers against fraud. *Id.* The court further held that the bank had no duty to investigate the entity opening the account and to thereafter supervise and monitor account transactions. *Id.* at 760.

It is likewise sound policy not to expand a bank's general duties to non-customers. "[A] bank has no duty to customers of other banks. With billions of banking transactions occurring in New York alone, this would be the equivalent of making New York banks liable to the world's banking public." *Lerner*, 459 F.3d at 286–87. To refuse to distinguish between a bank's customers and non-customers would "impos[e] on banks endless, unpredictable liability," *Chaney v. Dreyfus Serv. Corp.*, 595 F.3d 219, 231 (5th Cir. 2010), and "expose banks to unlimited liability for unforeseeable frauds." *Eisenberg*, 301 F.3d at 226.

Indeed, to the extent Mr. Flaherty alleges that Wells Fargo owed him a common law duty in processing the wire transfer, that is incorrect. *See* Compl. ¶ 27 ("Wells Fargo had a duty of care to Flaherty when accepting his wire . . . ."). UCC Article 4A, as enacted by Nevada, is "intended to be the *exclusive means* of determining the rights, duties and liabilities of the affected parties in any situation covered by particular provisions of the Article." NRS 104A.4102, UCC cmt (emphasis added). In other words, because Article 4A establishes the standards of care and limitations on liability for wire transfers, common law claims that alter Article 4A's standards and limitations are not actionable. *See, e.g., Sliders Trading Co. L.L.C. v. Wells Fargo Bank, N.A.*, No. 17-CV-04930-LB, 2017 WL 6539843, at *8 (N.D. Cal. Dec. 21, 2017) (holding UCC 4A displaces negligence claim and granting Wells Fargo's motion to dismiss). If such claims were actionable, the very purpose of the UCC would be thwarted, and the statute would be rendered meaningless. *See, e.g., Psak, Graziano, Piasecki & Whitelaw v. Fleet Nat. Bank*, 390 N.J. Super. 199, 204 (2007) ("Indeed, the UCC displaces the common-law where reliance on the common law would thwart the purposes of the UCC."); *Halla v. Norwest Bank Minnesota, N.A.*, 601 N.W. 2d 449, 451 (Minn. App. 1999) ("For the U.C.C. to be effective, parties in commercial transactions must be able to rely on the remedies provided by the Code. We see no reason to sacrifice the certainty and consistency of the U.C.C. remedies to preserve common law remedies…."); *Crawford v. JP Morgan Chase Bank, N.A.*, 08-CV-12634, 2009 WL 1913415, at *5 (E.D. Mich. June 30, 2009) ("The UCC also

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

1  displaces the common law when, 'reliance on the common law would thwart the purposes of the

2  Code.'").

3  Further, placing a duty on banks to monitor account activity for wrongdoing would

4  undermine the present banking system that "require[s] banking transactions to be processed quickly

5  and automatically and impose[s] strict deadlines for payment or timely dishonor of checks."

6  *Chazen v. Centennial Bank*, 61 Cal. App. 4th 532, 539 (Cal. Ct. App. 1998).  Indeed, banks "could

7  not function effectively" if required to "track transactions … or to intervene in suspicious activity."

8  *Id.*

9  Additionally, banks have obligations to maintain the privacy of their customers' banking

10  information.  To extend a duty of care to noncustomers "to inform on suspicious customers" would

11  wrongfully result in the "loss of privacy, expense and commercial havoc", and would force banks

12  to "act as the guarantor" of their customers' banking activities.  *Chicago Title Ins. Co. v. Superior*

13  *Court*, 174 Cal. App. 3d 1142, 1159 (Cal. Ct. App. 1985); *see also Karen Kane, Inc. v. Bank of Am.*

14  *Nat'l Trust & Sav. Ass'n*, 67 Cal.App.4th 1192, 1199 (Cal. Ct. App. 1998) (stating that such a duty

15  would impose a considerable burden on banks and would substantially impede the flow of

16  commerce).

17  Mr. Flaherty admits he is not a Wells Fargo customer.  Compl. ¶ 18.  Notwithstanding its

18  status as a noncustomer, he would have this Court disregard Wells Fargo's duty to its customers

19  and scrutinize each wire transfer for any suspicion of wrongdoing, to the detriment of an

20  expeditious banking system, all for the benefit of a stranger.  That is not the law.

21  Wells Fargo does not have the duties to non-customer Mr. Flaherty upon which his

22  Complaint hinges.  With respect to negligence, the Complaint alleges that "Wells Fargo had a duty

23  of care to Flaherty when accepting his wire of $30,000 . . ."  Compl. ¶ 27  But the above law makes

24  clear that banks do not owe a duty of care to a non-customer third party like Mr. Flaherty, and that

25  absence of a duty of care by extension means that Wells Fargo had no duty to investigate, and no

26  liability that could arise from the failure to investigate.  Without a duty of care owed to Mr. Flaherty,

27  the first prong of a negligence claim cannot be met as a matter of law.

28  / / /

Snell & Wilmer

L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

**B.** **It is Undisputed That Wells Fargo Did Not Have Actual Knowledge of Fraud, Which is Fatal to Mr. Flaherty's Negligence Claim.**

It is well-settled that a bank does not owe a duty of care to a noncustomer with whom it has no relationship, but some courts have recognized a narrow exception where certain "extraordinary and specific facts" exist, meaning that the bank knowingly participated in fraud. *Ballard v. Royal Trust Bank*, 202 F.3d 277, *2 (9th Cir. 1999) (unpublished disposition) quoting *Software Design & Application*, 49 Cal.App.4th at 481; *see also Ramsey v. Hancock*, 79 P.3d 423, 426 (Utah Ct. App. 2003) ("This rule is based on the legal principle that there is no privity between the parties and that therefore the bank owes a stranger no duty of vigilance.").  For a circumstance to be considered extraordinary, and thus impose on banks a duty for the benefit of a noncustomer, the bank must have knowledge of a fraud being committed and give "substantial assistance or encouragement to the other to so act." *Evans*, 779 Fed. Appx. at 444–45 (citing *S. Tr. & Commerce Bank v. San Diego Sav. Bank*, 212 P. 385, 388 (Cal. 1922) (when a bank knows a customer is perpetrating fraud, it may not assist the customer in accomplishing the tort); *Casey v. U.S. Bank, N.A.*, 127 Cal. App. 4th 1138, 1153 (Cal. Ct. App. 2005)).  Stated differently, for a bank to have a duty to a noncustomer, and thus be ordered to "make good the loss that results from the misappropriation", the bank must "knowingly make[] itself a party to a fraud." *S. Tr. & Commerce Bank*, 212 P. at 388.

In the context of a check presented for deposit, a limited duty of inquiry for the benefit of a noncustomer only arises when the "checks presented for deposit bear[] some objective signs of fraud." *Ballard*, 202 F.3d at *2.  Otherwise, to impose a duty of inquiry on a bank where it has no knowledge of tortious acts "would virtually require banks to offer not only financial, but investigatory, services." *Id*. (citing *Karen Kane*, 67 Cal.App.4th at 1199 (stating that such a duty would impose a considerable burden on banks and would substantially impede the flow of commerce)).

The duty for the benefit of a noncustomer is narrowly construed, and only imposed when the bank has actual knowledge of wrongdoing, for important policy reasons.  As a practical matter, placing a duty on banks to monitor account activity for wrongdoing would undermine the present banking system that "require[s] banking transactions to be processed quickly and automatically and

impose[s] strict deadlines for payment or timely dishonor of checks." *Chazen*, 61 Cal. App. 4th at 539. Indeed, banks "could not function effectively" if required to "track transactions … or to intervene in suspicious activity." *Id*. Additionally, banks have obligations to maintain the privacy of their customers' banking information. To extend a duty of care to noncustomers "to inform on suspicious customers" would wrongfully result in the "loss of privacy, expense and commercial havoc", and would force banks to "act as the guarantor" of their customers' banking activities. *Chicago Title Ins. Co.*, 174 Cal. App. 3d at 1159.

Mr. Flaherty has not alleged – nor could he – that Wells Fargo had actual knowledge that a hacker sent Plaintiff wiring instructions through Mr. Flaherty's colleague's hacked email account. Despite the fact that Wells Fargo did not have actual knowledge of a fraud apparently being committed by a hacker, Mr. Flaherty attempts to impose a duty on Wells Fargo to become an investigator, in addition to a banker. Unfortunately for Mr. Flaherty, that is contrary to the law and the policy considerations underpinning it. Without a duty of care owed to Mr. Flaherty, the first prong of a negligence claim cannot be met as a matter of law. Mr. Flaherty's negligence claim must be dismissed.

### III.  MR. FLAHERTY'S NEGLIGENCE PER SE CLAIM ALSO FAILS AS A MATTER OF LAW BECAUSE THE REGULATIONS CITED IMPOSE NO DUTY ON WELLS FARGO TO PLAINTIFF.

Under the negligence per se doctrine, the violation of certain protective statutes can satisfy the duty and breach elements of negligence. *Ashwood v. Clark County*, 113 Nev. 80, 86, 930 P.2d 740, 743 (1997). "Under a theory of negligence per se, a plaintiff must allege that (1) he or she belongs to a class of persons that a statute is intended to protect, (2) the plaintiff's injuries are the type the statute is intended to prevent, (3) the defendant violated the statute, (4) the violation was the legal cause of the plaintiff's injury, and (5) the plaintiff suffered damages." *InjuryLoans.com, LLC v. Buenrostro*, 529 F.Supp.3d 1178, 1186-87 (D. Nev. 2021). Here, Mr. Flaherty bases his claim on Wells Fargo's alleged violation of FinCEN regulations, 31 C.F.R. §§ 1010, 1020, 1023, 1024 and 1026. Compl. ¶ 65. But Mr. Flaherty has failed to plead a cognizable claim for two independent reasons: (1) Mr. Flaherty relies on regulations, not a protective statute and (2) a

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

negligence per se theory can proceed only if a defendant owed the plaintiff an underlying duty – which Wells Fargo did not owe to Mr. Flaherty here.

**A.    Mr. Flaherty Has Failed to Plead a Violation of Any Statute.**

Mr. Flaherty claims that "[p]ursuant to US Department of Treasury Financial Crimes Enforcement Network ("FinCEN") rules applicable (31 CFR Parts 1010, 1020, 1023, 1024, and 1026) . . . Defendant Wells Fargo was *inter alia* required to identify and verify the identity of its customers, and to understand the nature and purpose of customer relationships to develop customer risk profiles."  Compl. ¶ 65.  "A negligence per se claim arises when a duty is created by statute." *Sanchez*, 125 Nev. at 828, 221 P.3d at 1283.  As Mr. Flaherty merely relies on regulations, his negligence per se claim fails.

Further, the statutory basis for those FinCEN regulations is the Bank Secrecy Act ("BSA") and courts "have held unanimously that there is no private right of action under the Bank Secrecy Act, Patriot Act, and associated regulations either independently or under a theory of negligence per se." *InjuryLoans.com*, 529 F.Supp.3d at 1186 (citing *Venture Gen. Agency, LLC v. Wells Fargo Bank, N.A.*, No. 19-cv-02778-TSH, 2019 WL 3503109, at *6 (N.D. Cal. Aug 1, 2019) (collecting cases)); *see also* 2A I.R.M. Abr. & Ann. § 4.26.5.2.5 ("Effective March 1, 2011, Treasury reorganized, renumbered, and reissued the BSA regulations to 31 CFR Chapter X, Parts 1000–1099, from 31 CFR Part 103."); *Shtutman v. TD Bank, N.A.*, No. 14-792-JEI-AMD, 2014 WL 1464824, at *2 (D.N.J. Apr. 15, 2014) ("[I]t is undisputed that there is no private right of action under the Bank Secrecy Act or the relevant regulations.").  For these reasons, Mr. Flaherty's negligence per se claim fails as a matter of law.

**B.    Negligence Per Se Cannot Stand Where, as Here, the Defendant Does Not Owe the Plaintiff a Duty of Care.**

Despite Mr. Flaherty's conclusory allegations, the BSA and its implementing regulations were not designed to protect him as detailed below.  Although Mr. Flaherty assumes that any regulatory violations can give rise to negligence per se, it is well-established that this theory requires that a defendant first owe the plaintiff an underlying duty of care – one established under common law or through a statute that creates civil liability.  Here, as discussed above, Wells Fargo

Snell & Wilmer
L.L.P.
LAW OFFICES
1883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

did not owe a common-law duty to him as a non-customer.  Therefore, the negligence per se claim

fails as a matter of law for this independent reason.

> **1.** ***In the absence of an underlying common-law duty of care, a statute can only support a negligence per se theory if the legislature intended to create civil liability.***

Many treatises and courts have explained that a "violation of a statute *has no negligence*

*per se effect* in cases where the common law recognized no duty of care at all."  Dan B. Dobbs, et

al., *The Law of Torts* § 158 (2d ed.) (emphasis added).  Absent a common-law duty, a statute can

only impose a *new* duty if a plaintiff demonstrates that the legislature intended to impose civil

liability by creating a new private right of action under that statute.  *Cuyler v. United States*, 362

F.3d 949, 952 (7th Cir. 2004); *Marquay v. Eno*, 662 A.2d 272, 277 (N.H. 1995) (stating that, where

"there is no underlying common law cause of action . . . [t]he court must undertake . . . an

examination of the statute to determine whether there exists any explicit or implicit legislative intent

that a violation of a statute should give rise to a tort cause of action" (quoting *Bob Godfrey Pontiac,*

*Inc. v. Roloff*, 630 P.2d 840, 844 (Or. 1981)).

In *Hamm v. Carson City Nugget, Inc.*, the Nevada Supreme Court first applied this no-duty

principle and recognized that not all statutory violations can give rise to negligence per se.  85 Nev.

99, 100, 450 P.2d 358, 359 (1969).  There, a tavern allegedly violated a since-repealed statute that

prohibited serving alcohol to an inebriated person by overserving a patron who then drove under

the influence and killed another driver.  *Id*. at 99, 102 & n.1, 450 P.2d at 358, 360 & n.1.  In denying

the wrongful-death claim asserted by the decedent's estate, the Supreme Court held that, at common

law, "[a] liquor vendor was not responsible to innocent third persons for injury or death due to the

inebriated person's conduct."  *Id*. at 100, 450 P.2d at 359.  So, although the plaintiff-estate *also*

claimed that the alleged violation of the alcohol statute gave rise to negligence per se, this theory

lacked an underlying common-law duty.  The Court therefore looked for indications that the

Nevada Legislature intended that this statute independently give rise to civil liability.  *Id*. at 102,

450 P.2d at 360.  But unlike other related statutes in the same NRS Chapter, the statute at issue did

not include language expressly creating a new private right of action.  The Court therefore

1  concluded that a violation of that statute "does not impose civil liability upon one in charge of a

2  saloon or bar, nor is such a violation negligence per se." *Id*.

3      Likewise, courts outside this state have applied this no-duty principle to statutes, like the

4  BSA, that affirmatively require an individual or entity to report potential harm inflicted on a third-

5  party.  For instance, in *Cuyler,* the Seventh Circuit Court of Appeals addressed the difficult case of

6  a child who died from injuries inflicted by his babysitter, who had previously abused a different

7  child who was taken to a hospital for treatment. 362 F.3d at 951.  Because certain medical personnel

8  had failed to report the earlier, non-fatal abuse as required under Illinois' mandatory-reporting

9  statute, the decedent's parents sued those personnel, asserting that the statutory violation was

10  negligence per se.  *Id*.  But because there is "no common law duty to warn or rescue," the reporting

11  statute could only give rise to negligence per se if that statute created a new private right of action.

12  *Id*. at 951, 954.  Ultimately, the court found no intent to create civil liability given that the reporting

13  "statute contains no reference to damages or other tort-type remedies," it imposes criminal and

14  disciplinary sanctions only, and "[n]othing in the statute's text indicates that the legislature meant

15  to expand the scope of tort liability to encompass people who fail to report child abuse . . . ." *Id*. at

16  954.

17      The Seventh Circuit also explained the significance of the underlying-duty requirement.

18  Absent this principle, "every statute that specified a standard of care would be automatically

19  enforceable by tort suits for damages—every statute in effect would create an implied private right

20  of action—*which clearly is not the law*." *Id*. at 952 (emphasis added).  Court have thus applied this

21  no-duty principle to preclude negligence per se theories premised on a wide variety of statutes,

22  including other mandatory-reporting laws, mine-safety regulations, and various provisions of

23  HIPAA. *See, e.g.*, *Marquay*, 662 A.2d at 277; *Myers v. United States*, 17 F.3d 890, 898 (6th Cir.

24  1994); *Parker v. Carilion Clinic*, 819 S.E.2d 809, 825 (Va. 2018); *Faber v. Ciox Health*, LLC, 944

25  F.3d 593, 599 (6th Cir. 2019).

26      Likewise, because Wells Fargo does not owe Mr. Flaherty a duty at common law or under

27  the BSA implementing regulations, his negligence per se theory cannot stand.

28  / / /

Snell & Wilmer
L.L.P.
LAW OFFICES
1883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

2. ***Wells Fargo does not owe a common-law duty to plaintiff, a non-customer.***

At least two independent tort principles establish the lack of a common-law duty running between Wells Fargo and Plaintiff.  <u>First</u>, it is well-established under Nevada law that, absent a special relationship between the parties, "no duty is owed to control the dangerous conduct of another or to warn others of the dangerous conduct." *Sanchez*, 125 Nev. at 824, 221 P.3d at 1280. Most authorities recognize only four such relationships: a common carrier and his passenger; an innkeeper and his guest; a possessor of land or a business and its invitees; and a custodian and his ward.  *See, e.g.*, Restatement (Second) of Torts § 314A.  Thus, regardless of how foreseeable it is that a third-party will harm a plaintiff, the defendant has no duty to prevent that harm unless one of these special relationships is present. *Sanchez*, 125 Nev. at 822–26, 221 P.3d at 1279–82 (holding that pharmacies held no duty towards drivers and passengers harmed by a third-party under the influence of opioid prescriptions that the defendant pharmacies dispensed to that third-party despite receiving notice from a state task force that she was likely abusing these prescriptions).  The Nevada Supreme Court has explained that this principle prevents the creation limitless tort liability – "a zone of risk [that] would be impossible to define." *Id.* at 825, 221 P.3d at 1281 (quoting *Dent v. Dennis Pharmacy, Inc.*, 924 So.2d 927, 929 (Fla. Ct. App. 2006)).

<u>Second</u>, it is undisputed that Mr. Flaherty is not a customer of Wells Fargo,[2] and "[t]he almost-universal law in this country is that banks owe a duty of care *only* to their own customers," and do *not* owe a duty of care to third parties or non-customers.  *SFS Check*, 774 F.3d at 357 (emphasis added); *see also Evans*, 779 F. App'x at 444 (holding that, under California law, banks generally owe no duty to non-customers); *Midwest Feeders*, 886 F.3d at 519 (holding that a bank generally owes no duty to a non-customer); *Eisenberg*, 301 F.3d at 225 (recognizing that courts in numerous jurisdictions have held that a bank does not owe a duty of care to a noncustomer with whom the bank has no direct relationship and holding that a bank does not owe a duty of care to a customer); *Chang*, 845 F.3d at 1094 (holding that as a general matter, "a bank does not owe a duty

---

[2] *See* NRS 104.4104(1)(e) (defining "customer" as "any person having an account with a bank or for whom a bank has agreed to collect items and includes a bank carrying an account with another bank"); *Krump Const. Co. v. First Nat'l Bank of Nevada*, 98 Nev. 570, 572, 655 P.2d 524, 525 (1982).

Snell & Wilmer

L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

of care to a noncustomer with whom the bank has no direct relationship"); *Conder*, 384 F.3d at 399 (recognizing and endorsing the majority rule refusing "to impose on banks a general duty of care toward persons who are not their customers and to whom therefore they have no contractual obligations").

Courts have applied this no-duty rule even when a non-customer is defrauded by the bank's customer through use of its services. *See, e.g.*, *Eisenberg*, 301 F.3d at 225; *Lerner*, 459 F.3d at 286–87; *Software Design & Application*, 56 Cal. Rptr. 2d at 760; *McCallum*, 1995 WL 1146812, *2 ("The mere fact that a bank account can be used in the course of perpetrating a fraud does not mean that banks have a duty to persons other than their own customers.  To the contrary, the duty is owed exclusively to the customer, not to the persons with whom the customer has dealings.").

And like the more general principle that the Nevada Supreme Court recognized in *Sanchez*, the no-duty-to-non-customers rule discussed above is designed to prevent financial institutions from incurring limitless liability based on third-party misconduct.  Indeed, to refuse to distinguish between a bank's customers and non-customers would "impos[e] on banks endless, unpredictable liability," *Chaney*, 595 F.3d at 231, and "expose banks to unlimited liability for unforeseeable frauds." *Eisenberg*, 301 F.3d at 226; *accord Lerner*, 459 F.3d at 286–87 ("[A] bank has no duty to customers of other banks.  With billions of banking transactions occurring in New York alone, this would be the equivalent of making New York banks liable to the world's banking public.").

Here, these principles establish that Wells Fargo had no common-law duty to protect Mr. Flaherty from an alleged fraudulent scheme executed by a third-party given that Wells Fargo and Plaintiff lack a special relationship.  And similarly, the law recognizes that Wells Fargo owes no duty towards Mr. Flaherty as a non-customer.

### 3. *The BSA and its implementing regulations do not impose civil liability.*

As discussed above, in the absence of a common-law duty, a plaintiff must demonstrate that the statute at issue gives rise to a new duty by creating a new private right of action that imposes civil liability for conduct that would not have given rise to a claim at common law.  The BSA imposes "a duty on banks and financial institutions to report suspicious activity indicative of criminal activities to the government of the United States." *Towne Auto Sales, LLC v. Tobsal Corp.*,

2017 WL 5467012, at *2 (N.D. Ohio Nov. 14, 2017).  "While these statutes [such as the BSA] provide for civil and criminal penalties, a defendant's liability for failure to comply is to the United States government." *Venture Gen. Agency*, 2019 WL 3503109, at *7.  "Further, as there is no private right of action, there can be no duty of care arising out of the BSA's monitoring requirements." *Venture Gen. Agency*, 2019 WL 3503109, at *7.  Because the BSA does not create a private right of action, its implementing regulations, or the statute itself, cannot support Plaintiff's negligence per se theory.

Accordingly, the BSA and its implementing regulations do not create a new duty that did not exist at common law and therefore cannot support Plaintiff's negligence per se theory.[3]

## IV.   PLAINTIFF'S CLAIM THAT WELLS FARGO VIOLATED UCC ARTICLE 4A ALSO FAILS AS A MATTER OF LAW.

### A.   Wells Fargo is Immune from Suit under the UCC Safe Harbor Provision Because Plaintiff Does Not Allege Wells Fargo Had Actual Knowledge of the Name-Number Mismatch.

Plaintiff's claim that Wells Fargo violated NRS 104A.4207(2)(b) fails as a matter of law because there are no allegations that Wells Fargo had actual knowledge of the alleged name-number mismatch in Plaintiff's payment order.

Nevada enacted Article 4A of the UCC at NRS 104A.4101 et seq.  *See* NRS 104A.4101 ("This article may be cited as Uniform Commercial Code – Funds Transfers.").  Article 4A uses specific terms to identify the parties and procedures involved in a funds transfer, which is defined as "the series of transactions, beginning with the originator's payment order, made for the purpose of making payment to the beneficiary of the order."  NRS 104A.4104(1).  The originator is "the sender of the first payment order in a funds transfer."  Moreover, "'[s]ender' means the person giving the instruction to the receiving bank."  NRS 104A.4103(1)(e).  The "'[o]riginator's bank' means the receiving bank to which the payment order of the originator is issued."  NRS 104A.4104(4); *see* NRS 104A.4103(1)(d) ("'Receiving bank' means the bank to which the sender's

---

[3] Plaintiff also claims that Wells Fargo did not "report the fraud to local law enforcement authorities", claiming that such actions are required under the FinCEN regulations.  Compl. ¶¶ 21-22.  Under the BSA, Wells Fargo would file a Suspicious Activity Report ("SAR") to report any illegal activity but is prohibited from disclosing a SAR or any information that would reveal the existence of a SAR.  12 C.F.R. § 21.11(k)(1)(i).

Snell & Wilmer

L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

instruction is addressed."). A "'[p]ayment order' means an instruction of a sender to a receiving bank . . . to pay . . . a fixed or determinable amount of money to a beneficiary." NRS 104A.4103(1)(a). The "beneficiary" is "the person to be paid by the beneficiary's bank," which "means the bank identified in a payment order in which an account of the beneficiary is to be credited . . . ." NRS 104A.4103(1)(b)-(c). Here, Plaintiff (the originator) issued a payment order instructing his bank, UBS (the originator's bank), to wire $30,000 to the hackers' (the beneficiaries) bank account with Wells Fargo (the beneficiary's bank). Compl. ¶¶ 14-15.

The Complaint alleges that, unbeknownst to Mr. Flaherty, the hackers had commandeered Levetown's email and impersonated Levetown in emails to him. Compl. ¶¶ 13-14. In one such email, the hackers sent Mr. Flaherty "what purported to be the bank account and wiring details for the client trust account of Levetown's firm[.]" *Id.* at ¶ 14. Mr. Flaherty instructed his bank to wire funds pursuant to the Wells Fargo bank account provided by the hackers, and he now alleges that Wells Fargo "knew or should have known that the wire transfer order identified different persons by name and number[.]" *Id.* at ¶¶ 15, 54. In other words, Mr. Flaherty's payment order identified the beneficiary by both name and number, the name being the client trust account of Levetown's law firm and the number being the hackers' bank account.

NRS 104A.4207, titled misdescription of beneficiary, sets forth the course of action that a beneficiary's bank must follow when the name and account number on a payment order does not match. That statute turns on whether the beneficiary's bank (here, Wells Fargo) had actual knowledge of the name-number mismatch. Section 2(a) applies "if the beneficiary's bank does not know that the name and number refer to different persons," while section 2(b) applies if the bank "knows that the name and number identify different persons[.]"

In this context, "'[k]nowledge' means actual knowledge" and "'[k]nows' has a corresponding meaning." NRS 104.1202(2); *see* NRS 104A.4207, UCC cmt. 2 (referring to UCC definition of "know" as meaning "actual knowledge"); *Golden State Concessions LLC v. Wells Fargo Bank NA*, No. 21-CV-00014-KAW, 2021 WL 5002222, at *3 (N.D. Cal. Mar. 10, 2021) (under UCC 4A "[t]he knowledge requirement, in turn, requires actual knowledge; constructive knowledge is insufficient to establish a violation"); *Intel Corp. Inv. Pol'y Comm. v. Sulyma*, 140 S.

Ct. 768, 776, 206 L. Ed. 2d 103 (2020) ("Although ERISA does not define the phrase 'actual knowledge,' its meaning is plain[,]" and explaining "to have 'actual knowledge' of a piece of information, one must in fact be aware of it.").

Pursuant to NRS 104A.4207(2)(a), so long as a beneficiary bank lacks actual knowledge of the mismatch at the time of payment, that statute expressly authorizes the bank to rely solely on the number, having no obligation to investigate for mismatches with the provided name:

> "[I]f the beneficiary's bank does not know that the name and number refer to different persons, *it may rely on the number* as the proper identification of the beneficiary of the order. The beneficiary's bank *need not determine* whether the name and number refer to the same person.

NRS 104A.4207(2)(a).  Although no Nevada cases have directly addressed that UCC provision, given the uniform nature of the UCC, the decisions of other courts are instructive.  *See, e.g., U.S. Nat. Bank of Oregon v. Boge*, 311 Or. 550, 564, 814 P.2d 1082 (1991) ("[T]he legislative intent to make the UCC a uniform code makes relevant the decisions of other courts that have examined these questions . . . .").  Courts have explained that this section of the UCC "provides, in effect, immunity from responsibility—a 'safe harbor'—for a beneficiary's bank that relies on the account number specified in a wire transfer order to identify the beneficiary of the order." *TME Enterprises, Inc. v. Norwest Corp.*, 124 Cal. App. 4th 1021, 1031, 22 Cal. Rptr. 3d 146 (2004); *see, e.g., Grand Bayman Belize, Ltd. v. Wells Fargo & Co.*, 514 F. Supp. 3d 1188, 1194 (C.D. Cal. 2021) (holding safe harbor applies because "[n]o evidence suggests that Wells Fargo had actual knowledge of a mismatch when it processed the wire based solely on the account number").  The official UCC comments explain that this safe harbor provision "allows banks to utilize automated processing by allowing banks to act on the basis of the number without regard to the name if the bank does not know that the name and number refer to different persons." UCC 4A-2070, cmt. 2.  Here, Plaintiff alleges that Wells Fargo "knew or should have known that the wire transfer order identified different persons by name or number[.]" Compl. ¶ 54.  By alleging the alternative "or should have known," Plaintiff concedes that he does not know whether Wells Fargo had actual knowledge of the name-number mismatch.  Because, of course, if Mr. Flaherty had a basis to allege that Wells Fargo had actual knowledge of the mismatch, there would be no need to allege that Wells Fargo,

- 18 -

in the alternative, "should have known" of the mismatch.  Indeed, Mr. Flaherty has not alleged any facts indicating Wells Fargo had actual knowledge of the name-number mismatch.  That is fatal to Mr. Flaherty's claim.  *See Sliders Trading*, 2017 WL 6539843, at *8 (granting motion to dismiss, explaining "[plaintiff's] argument is that Wells Fargo should have noticed red flags surrounding the transactions.  But that does not translate to Wells Fargo's actual knowledge.").

A recent decision of the Central District of California is on point.  In *Serviacero Especiales SA DE CV v. JPMorgan Chase Bank, N.A.*, 2021 WL 4805448 (C.D. Cal. July 15, 2021), the court granted the defendant bank's motion to dismiss, explaining "Plaintiff alleges no facts that demonstrate that Defendant actually knew of the discrepancy. Rather, Plaintiff alleges that the wiring instructions named GML Steel SA as the beneficiary, and therefore that Defendant knew of the discrepancy." *Id.* at *2.  But, as the court explained, "it was not Defendant's duty to discover the discrepancy between beneficiary name and account number."  *Id.* (emphasis in original). Accordingly, the court held that the plaintiff's "conclusion that Defendant knew of the discrepancy does not change the fact that Plaintiff has alleged no facts to support that inference, beyond the bald assertion that the name and number on the payment did not match."  *Id.* (emphasis in original).

So too, here.  At most, Mr. Flaherty baldly alleges that Wells Fargo knew of the mismatch— and even that much is suspect, for the reasons above.  That is not enough to state a claim against Wells Fargo under the Nevada equivalent of UCC 4A.  However, Mr. Flaherty, or his bank (the originator's bank), may have a claim against the hackers.  NRS 104A.4207(4) provides that, in situations such as this, "if the beneficiary's bank rightfully pays the person identified by number and that person was not entitled to receive payment from the originator, the amount paid may be recovered *from that person* to the extent allowed by the law governing mistake and restitution . . . ." (emphasis added).

Absent actual knowledge of the name-number mismatch, Wells Fargo is entitled to rely solely on the account number on the payment order.  According to the Complaint, that is precisely what Wells Fargo did here.  *See* Compl. ¶¶ 16-17 (Mr. Flaherty provided wiring receipt to Levetown, who informed plaintiff "that the Wells Fargo account was not his client trust

account[.]").  Wells Fargo is, therefore, immune from liability under the safe harbor provision of NRS 104A.4207(2)(a).  Accordingly, Plaintiff's claim fails as a matter of law.

**B.     The UCC Commercially Reasonable Practices Sections Do Not Apply to Mr. Flaherty as a Noncustomer.**

Mr. Flaherty further alleges that "[i]n failing to maintain commercially reasonable practices . . . Wells Fargo violated UCC Article 4A (NRS 104A) . . ."  Compl. ¶ 55.  However, as discussed above, Plaintiff admits in his Complaint that he is not a customer of Wells Fargo.  (*Id.* at ¶ 18.) Therefore, Mr. Flaherty's UCC claim fails because he has no right of recovery under Nevada Revised Statute sections 104A.4202 and .4204, the sections governing "commercially reasonable practices", as those sections only allocate risk as between a bank and *its customer* when there is an unauthorized funds transfer subject to the UCC.    NRS § 104A.4202(3) ("Commercial reasonableness of a security procedure is a question of law to be determined by considering the wishes of the *customer* expressed to the bank, the circumstances of the *customer* known to the bank, including the size, type and frequency of payment orders normally issued by the *customer* to the bank, alternative security procedures offered to the *customer*, and security procedures in general use by *customers* and receiving banks similarly situated.") (emphasis added); NRS § 104A.4204(1) ("If a receiving bank accepts a payment order issued in the name of its *customer* as sender which is not authorized and not effective as the order of the *customer* under NRS 104A.4202, or not enforceable, in whole or in part, against the *customer* under NRS 104A.4203, the bank shall refund any payment of the payment order received from the *customer* . . .") (emphasis added).  Sections 202 and 204 do not grant noncustomers, like Plaintiff, a right of recovery.

"Article 4A of the UCC [ ] was meant to govern the rights, duties, and liabilities of banks and their commercial customers with respect to electronic funds transfers."  *Patco Const. Co., Inc. v. People's United Bank*, 684 F.3d 197, 207 (1st Cir. 2012); *see also Choice Escrow & Land Title, LLC v. BancorpSouth Bank*, 754 F.3d 611, 616 (8th Cir. 2014) ("The drafters of Article 4A sought to create a legal framework that balanced these rights and obligations between the bank and its institutional customer.")  Thus, the "commercially reasonable practices" cited by Plaintiff are meant to determine how loss is allocated between a bank and *its customer* when there is an unauthorized

Snell & Wilmer
L.L.P.
LAW OFFICES
1883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

- 20 -

payment resulting in loss to the customer.  Although Mr. Flaherty may have a claim against the person or people who sent the fraudulent wire instructions via a hacked email account, Mr. Flaherty simply does not have a claim against Wells Fargo.  For these additional reasons, Mr. Flaherty's claim that Wells Fargo violated UCC Article 4A fails as a matter of law.

**V.   MR. FLAHERTY'S CLAIM FOR VIOLATION OF NRS 41.1395 FAILS AS TO WELLS FARGO BECAUSE HE HAS NO VALID CLAIMS AGAINST WELLS FARGO AND DOES NOT ALLEGE THAT WELLS FARGO KNEW MR. FLAHERTY'S AGE, EVEN THOUGH HE IS A NONCUSTOMER.**

Mr. Flaherty claims that he is "more than 60 years of age" and he is therefore entitled to "two times his actual damages pursuant to NRS 41.1395 and well as attorneys fees and costs under NRS 41.1395(1)." Compl. ¶¶ 47-48.  As discussed above, all of his claims against Wells Fargo fail as a matter of law.  Therefore, he has no damages and the exemplary damages to actual damages calculation cannot be done under NRS 41.1395 or any other statute.

Further, NRS 41.1395(3) states that "[t]he provisions of this section do not apply to a person who caused injury, death or loss to a vulnerable person if the person did not know or have reason to know that the harmed person was a vulnerable person."  Mr. Flaherty does not allege that Wells Fargo knew his age, a noncustomer.  Therefore, Mr. Flaherty's claim under NRS 41.1395 fails for this reason as a matter of law.

## CONCLUSION

For the reasons stated above, all of Mr. Flaherty's claims against Wells Fargo fail as a matter of law because Mr. Flaherty is not a customer of Wells Fargo.  Wells Fargo owes no duty to him as a noncustomer, therefore, his claims for negligence and negligence per se both fail.  Mr. Flaherty's claim that Wells Fargo violated UCC Article 4A fails for the same reason.  Finally, because Wells Fargo had no reason to know the age of noncustomer Plaintiff, and Mr. Flaherty does not allege Wells Fargo had such knowledge, his claim for violation of NRS 41.1395 also fails as a matter of law.

/ / /

/ / /

/ / /

1    Wells Fargo respectfully requests that this Court grant its Motion to Dismiss in its entirety

2  and dismiss all claims against Wells Fargo in this litigation.

3

4  Dated:  January 20, 2022

SNELL & WILMER L.L.P.

5  By: */s/ Kelly H. Dove*
Kelly H. Dove, Esq.
6  Holly E. Cheong, Esq.
3883 Howard Hughes Parkway, Suite 1100
7  Las Vegas, NV 89169
*Attorneys for Defendant Wells Fargo Bank,*
8  *N.A.*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>**CERTIFICATE OF SERVICE**</u>

I, the undersigned, declare under penalty of perjury, that I am over the age of eighteen (18) years, and I am not a party to, nor interested in, this action.  On this date, I caused to be served a true and correct copy of the foregoing **MOTION TO DISMISS** by method indicated below:

☐　**BY FAX:**  by transmitting via facsimile the document(s) listed above to the fax number(s) set forth below on this date before 5:00 p.m. pursuant to EDCR Rule 7.26(a). A printed transmission record is attached to the file copy of this document(s).

☐　**BY U.S. MAIL:**  by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Las Vegas, Nevada addressed as set forth below.

☐　**BY OVERNIGHT MAIL:**  by causing document(s) to be picked up by an overnight delivery service company for delivery to the addressee(s) on the next business day.

☐　**BY PERSONAL DELIVERY:**  by causing personal delivery by, a messenger service with which this firm maintains an account, of the document(s) listed above to the person(s) at the address(es) set forth below.

■　**BY ELECTRONIC SUBMISSION:**  submitted to the above-entitled Court for electronic filing and service upon the Court's Service List for the above-referenced case.

☐　**BY EMAIL:**  by emailing a PDF of the document listed above to the email addresses of the individual(s) listed below.

DATED this 20th day of January, 2022.

*/s/ Maricris Williams*
An employee of SNELL & WILMER L.L.P.

4862-2826-3689

*Snell & Wilmer*
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

- 23 -